```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------- X
AMERICAN TRANSIT INSURANCE              :
COMPANY,                                :   MEMORANDUM
                                        :   DECISION AND ORDER
                    Plaintiff,          :
                                        :   19-cv-5171 (BMC)
         - against -                    :
                                        :
YULIA BILYK, et al.,                    :
                                        :
                                        :
                    Defendants.         :
----------------------------------------------------------- X
```

**COGAN**, District Judge.

Like all automotive accident insurance companies operating in New York, plaintiff American Transit Insurance Company ("ATIC") attracts some fraudulent or exaggerated policy claims under New York's no-fault insurance scheme. In response, ATIC has filed a RICO action against 29 named individuals and companies and another 40 John Doe individuals and companies, and has generally identified an unknown number of other entities not sued in this action, alleging that they constitute an "Enterprise" under RICO that has engaged in a pattern of racketeering activity. Many of the named defendants have settled, and those who haven't settled have defaulted. ATIC seeks a default judgment against those who have defaulted.

When a complaint is 186 pages long, plus more than 300 pages of annexed exhibits, and contains 58 claims for relief, that is a red flag that something may be wrong with it. Federal Rule of Civil Procedure 8(a) requires a short and plain statement of the case, and even in cases that require compliance with Rule 9(b), as does this one, particularity is not the same as verbosity.

Plaintiff has used surplusage to obscure the legal inadequacy of any RICO claims here. ATIC itself identifies the problem when, early on in its complaint, it asserts that the claims it alleges consist of "separate but fundamentally similar schemes." That is an understatement. In fact, the only "fundamental" similarity is that all the insurance claims upon which the complaint is based were either fictitious or overstated. But the schemes involved fraudulent claims of many different types; and so, beyond the underlying criminality of the acts, plaintiff appears to mistake genericism for proof of conspiracy.

The complaint actually purports to allege fifteen separate RICO schemes. Although the complaint alleges some defendants and unnamed coconspirators worked in teams of two, three or four to submit some number of these fraudulent insurance claims, there is no allegation that any of these groups worked with another group. There are no allegations that these groups shared the proceeds from the fraudulent claims or even had any knowledge of each other. Even within each separate RICO scheme, there are no particulars as to which of the many fraudulent methods the particular scheme utilized. This is not merely the absence of a hierarchical structure; it is the absence of any organization at all. What ATIC has done is simply taken dozens of separate actors who submitted claims that may have been fraudulent in a variety of unrelated ways and sued them all in one action.

A court cannot grant a default judgment on a complaint that fails to state a claim. The motion for a default judgment is therefore denied and the case is dismissed.

## SUMMARY OF COMPLAINT

The complaint identifies three categories of defendant – "Retail," Wholesale," and "No-Fault Clinics" – with each alleged enterprise generally comprised of one of every category. The complaint proceeds to explain how these three specialized types of defendants interacted as a

single unit to submit fraudulent claims at plaintiff's expense.  The "Retail Defendants" consist of medical supply companies and the individual defendants who own them; the "Wholesale Defendants" consist of companies and their owners who sell medical supplies to the Retail Defendants; the "No-Fault Clinics," which have not been sued in this action, provided or purported to provide medical services or devices to patients.  It is not clear if any of the patients, who are also not named, participated in the schemes or were simply a means to accomplish the submission of fraudulent claims.

The fraudulent claims began at the clinic level.  A No-Fault Clinic health care provider would write a prescription for an automobile accident patient.  Maybe this was a real accident patient; maybe it was a patient from a staged accident; maybe there was no patient at all, just the name of one who was insured.  In any event, the prescription would be "fraudulent."  That might mean, depending on the provider or what the provider chose to do, that it was "fabricated," or it might mean that the provider wrote the prescription "pursuant to a predetermined treatment protocol, regardless of medical necessity."  The complaint is not clear if some non-defendant No-Fault Clinics would use one or the other of these fraudulent devices or both of them.

The fraudulent prescriptions would be for one or more medical devices commonly needed by car accident victims.  The complaint lists the following as such possible prescribed devices, "among other things": cervical pillows, cervical traction units, cold/hot water circulating pumps, EMS units, infrared heat lamps, lumbar cushions, massagers, mattresses, and whirlpools.  The complaint refers to these and the "other things" as "durable medical equipment," or DME.  Or the fraudulent prescriptions might be for other items, "including without limitation, back braces, cervical collars, knee braces, and shoulder braces."  The complaint refers to these devices "without limitation" as "orthotic devices."  I am going to refer to all the DME and orthotic

devices as "medical supplies," but it bears noting that this covers a vast array of products, each of which may or may not compete in the wholesale or retail markets with similar products of different prices.

The next step would be for the No-Fault Clinic to enter into an "arrangement" with both a Retail Defendant and a Wholesale Defendant – although in some instances it might be only with the Retail Defendant, who then might enter into a separate arrangement with a Wholesale Defendant either as to a particular claim or perhaps for a group of claims that may or may not relate to claims filed by other No Fault Clinics. I am going to refer to each of these combinations of Clinic, Retail Defendant, and Wholesale Defendant as a "Team."

There are no uniform terms of each Team's "arrangements," but one way the scheme would occur is that a patient would receive a prescription for an "item of DME and/or orthotic device . . . pursuant to a predetermined course of treatment, irrespective of medical necessity, based on illicit kickback and/or other financial compensation agreements." Then, the Retail Defendant would put in an insurance claim and plaintiff would pay the Retail Defendant, with the proceeds split in ways that are not alleged.

Many of these schemes were dependent on the patients assigning their no-fault benefits to the No-Fault Clinic that treated them so that the No-Fault Clinic could submit the insurance claim. For example, in some cases, a Team would have a patient sign receipts acknowledging that he had received the medical equipment, even though he had not and never did. But in other cases, a Clinic patient actually received a device, and may indeed have benefited medically from it, although it might be a cheap device that a Wholesale Defendant had fraudulently invoiced as an expensive device.

4

The complaint further alleges that, for each fraudulent claim, the prescriptions were "generic." This enabled each Team to obscure whether the most or least expensive medical device was needed or provided, while allowing the claim to reflect the most expensive piece of medical equipment that could be covered by the generic description. The generic prescription also made it impractical or impossible for plaintiff to trace precisely the device that any patient had received and whether the patient actually needed it, or at least whether the patient could have used a cheaper model. Finally, it enabled the Wholesale Defendants to furnish the cheapest medical device that it listed while charging the Retailer for the most expensive comparable device. Once ATIC paid the insurance claim from the No-Fault Clinic, the inflated margin between the wholesale charge and the retail claim would constitute the proceeds of each fraud to divvy up among the Clinic, the Wholesale Defendant, and the Retail Defendant. At least, this was the way some Teams did the fraud "in some instances."

But there were "other instances" where the insurance claim was based on counterfeit items. The wholesalers who sold those devices, for some reason, are not named in the complaint. And there were still other times that Wholesale Defendants would actually supply the item shown in an invoice, but would not pass along the bulk discount they had received from manufacturers when they purchased items in bulk, instead sharing that with the Retail Defendants, who in turn would kick back a portion to the Clinics. ATIC alleges that the failure to pass on a bulk discount was also a fraud.

In fact, the complaint provides an itemized list of fourteen different schemes that unspecified Retail Defendants might use to file a fraudulent claim, "including, but not limited to" unspecified others, and eight different schemes that unspecified Wholesale Defendants might use to further the creation of a fraudulent insurance claim, alone or in combination.

5

What is common about these various fraudulent insurance claims submitted by the Teams? Other than being fraudulent, not much. The complaint alleges that defendants utilized a "common fraudulent blueprint as a business plan, sharing common documentation" and "the same fraudulent billing codes." The "blueprint" is apparently any of the various means described above to create an artificial gap between the legitimate wholesale price and the legitimate retail price of any particular item, or to cover up the lack of need or delivery of any device. In addition, however large the universe of medical devices at issue is (and it appears that it contains all the devices that an accident patient might possibly need), plaintiff is content to conclude that a particular scheme is connected with all the others so long as it involved at least one of the medical devices within that vast universe. Indeed, although we are told that the "related and parallel fraudulent billing schemes . . . trace back to a common genesis and framework," we are not told what that genesis is other than the fact that all the claims used one or more of the various devices described above. Finally, they all involved "kickbacks," although by kickbacks it seems clear that plaintiff means some division of extra money over and above the "proper" price – a price listed in New York's no-fault law – for a particular item, see N.Y. Ins. Law § 5108; 11 N.Y.C.R.R. § 68.1(a), or if no item was provided, then the full amount obtained from ATIC.

Fifty-seven of the fifty-eight separate claims for relief are divided into clusters of four consisting of a defendant, his wholly-owned corporation, and an unidentified number of miscreants who allegedly worked together.[1] Each package of four claims consists of a RICO claim against an individual defendant; one claim for common law fraud and one for unjust enrichment against the individual defendant and his wholly-owned corporation; and an "aiding

---

[1] One individual defendant, Maksym Tkachenko, is accused of running two RICO enterprises, each consisting of a corporation, so there is one additional RICO claim as to him.

and abetting claim" against John Does 1-20 and ABC Corporations 1-20. Each one of the claims describes the wholly owned corporation of a defendant as a RICO enterprise. The final, fifty-eighth claim is a catch-all declaratory judgment claim, seeking to absolve ATIC of the need to pay any further claims submitted by any of the defendants.

Perhaps recognizing the absence of any tangible connection among the array of defendants, schemes, or enterprises, plaintiff devotes a great deal of space in the complaint to arguing that "the virtually identical patterns of fraud . . . were not the product of happenstance, but instead were evidence of related and parallel fraudulent billing schemes that trace back to a common genesis and framework." According to plaintiff, for example, the Teams shared common documentation, used the same fraudulent billing codes, used the same No-Fault Clinics for prescriptions, employed the "same battery of DME" for nearly every patient, and made the same misrepresentations to ATIC. In support of this theory, plaintiff appends to its complaint twenty-eight separate charts, several of which purport to demonstrate a particular commonality that allegedly cannot – either alone or in combination with the others – be explained away as either coincidence or the result of common usage. For example, one of the charts lists "a representative sample of claims . . . in which the Retailers submitted fraudulent bills . . . with phantom codes." These "phantom codes" are reimbursement codes that were not listed in plaintiff's fee schedule at the time of the claim. According to plaintiff, "[t]he use of identical, nonexistent product codes to bill for the same items across multiple Retailers cannot be the result of coincidence."

For all of the above, plaintiff seeks "[c]ompensatory damages in an amount in excess of $401,100.00, the exact amount to be determined at trial." Plaintiff does not, however, explain in any detail how the damages relate to the alleged fraudulent acts. For example, it is not clear

7

whether plaintiff seeks damages for every payment made to defendants under its theory that the items were completely fabricated, or whether plaintiff seeks damages for the difference between the fraudulently invoiced more expensive device and the cheaper device that was actually provided, or some combination of these or any other method of calculating damages.

## DISCUSSION

### I. Default Judgment

Rule 55 of the Federal Rules of Civil Procedure establishes the two-step process for a plaintiff to obtain a default judgment. After the clerk enters the default of a defendant that "has failed to plead or otherwise defend," the Court may, on a plaintiff's motion, enter a default judgment if the defendant fails to appear or move to set aside the default under Rule 55(c). Fed. R. Civ. P. 55(a), (b)(2). On a motion for a default judgment, the Court "deems all the well-pleaded allegations in the pleadings to be admitted." Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., 109 F.3d 105, 108 (2d Cir. 1997) (citation omitted). However, the party in default does not admit conclusions of law. See Rolls-Royce plc v. Rolls-Royce USA, Inc., 688 F. Supp. 2d 150, 153 (E.D.N.Y. 2010).

"[J]ust because a party is in default, the plaintiff is not entitled to a default judgment as a matter of right." Mktg. Devs., Ltd. v. Genesis Imp. & Exp., Inc., No. 08-cv-3168, 2009 WL 4929419, at *2 (E.D.N.Y. Dec. 21, 2009). Rather, "it remains the plaintiff's burden to demonstrate that those uncontroverted allegations, without more, establish the defendant's liability on each asserted cause of action." Gunawan v. Sake Sushi Rest., 897 F. Supp. 2d 76, 83 (E.D.N.Y. 2012) (collecting cases); see Said v. SBS Elecs., Inc., No. 08-cv-3067, 2010 WL 1265186, at *2 (E.D.N.Y. Feb. 24, 2010) (unanswered complaint does not suffice to establish liability because "a default does not establish conclusory allegations, nor does it excuse any

8

defects in the plaintiff's pleading."), adopted as modified on unrelated grounds, 2010 WL 1287080 (E.D.N.Y. Mar. 31, 2010).

## II. RICO Claims

In order to "establish a RICO claim, plaintiffs must show: '(1) a violation of the statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury was caused by the violation of Section 1962.'" Spool v. World Child Int'l Adoption Agency, 520 F.3d 178, 183 (2d Cir. 2008) (quoting DeFalco v. Bernas, 244 F.3d 286, 305 (2d Cir. 2001)). To show a clear violation of 18 U.S.C. § 1962, plaintiffs must show conduct of an enterprise through a pattern of racketeering activity. DeFalco, 244 F.2d at 306 (citing Sedina, S.P.R.L. v, Imrex Co., Inc., 473 U.S. 479, 495 (1985)). The Second Circuit has established that "a plaintiff must plead 'the existence of seven constituent elements: (1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce.'" RxUSA Wholesale, Inc. v. Alcon Labs., Inc., 661 F. Supp. 2d 218, 244 (E.D.N.Y. 2009), aff'd, 391 F. App'x 59 (2d Cir. 2010) (quoting Moss v. Morgan Stanley, Inc., 719 F.2d 5, 17 (2d Cir. 1983)).

The complaint does not establish a combined enterprise, but instead alleges fifteen different enterprises that have no apparent connection to each other. "An enterprise is 'a group of persons associated together for a common purpose of engaging in a course of conduct,' as demonstrated 'by evidence of an ongoing organization . . . [and] by evidence that the various associates function as a continuing unit." Gov't Employees Ins. Co. v. Scheer, No. 13-CV-04039, 2014 WL 4966150, at *5 (E.D.N.Y. Aug. 18, 2014), report and recommendation adopted, 2014 WL 4966137 (E.D.N.Y. Sept. 30, 2014) (quoting First Capital Asset Mgmt., Inc. v.

9

Satinwood, Inc., 385 F.3d 159, 173 (2d Cir. 2004)). "[M]erely stringing together a list of defendants and labeling them an enterprise is insufficient to state a RICO claim." Cedar Swamp Holdings, Inc. v. Zaman, 487 F. Supp. 2d 444, 450 (S.D.N.Y. 2007). "An enterprise . . . must be more than the sum of the participants in a series of independent frauds." Id. at 452; see Moll v. U.S. Life Title Ins. Co., 654 F. Supp. 1012, 1031-32 (S.D.N.Y. 1987) (dismissing complaint containing allegations that members of enterprise provided settlement services to purchasers of real estate and received kickbacks, because it failed to "specify how these members joined together as a group to achieve these purposes," and lacked "factual allegations regarding the continuity of structure or personnel of this group"). "Courts have repeatedly held that a simple fraud scheme is insufficient to state a RICO violation." Ho Myung Moolson Co., Ltd. v. Manitou Mineral Water, Inc., 665 F.Supp.2d 239, 261 (S.D.N.Y. 2009)

      As described above, plaintiff alleges a RICO enterprise comprised of over a dozen separate groups of fraudsters, each of which has relationships among its respective members, but which do not appear to have any relationships between them.  Although the complaint claims that some defendants and unnamed coconspirators worked in Teams of two to four to submit some number of fraudulent claims, there is no allegation that any of these Teams worked with another, shared the proceeds from the fraudulent claims, or even had any knowledge of each other.  There is no suggestion that these Teams shared any type of common purpose.  Instead, plaintiff asks me to assume the Teams worked together simply because the contours of the disparate schemes were similar and they used some of the same, nonexistent billing codes.  But any such assumption relies too much on speculation and is insufficient to demonstrate a single combined enterprise.

10

Even within each separate alleged RICO scheme, plaintiff has failed to demonstrate defendants' liability. A default does not excuse defects in the plaintiff's pleading. See Said, 2010 WL 1265186, at *2. "An essential element of any RICO violation is a pattern of racketeering activity." Ho Myung Moolsan, 665 F. Supp. 2d at 259. "Where predicate acts are based on fraudulent conduct, plaintiffs must comply with the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure to state a claim under RICO." Id. at 260. "When alleging mail or wire fraud, this means that a plaintiff must allege, 'the contents of the communications, who was involved, [and] where and when they took place, and [should] explain why they were fraudulent.'" Id. (quoting Spool, 520 F.3d at 185). "Rule 9(b) is not satisfied by filing a complaint in which defendants are clumped together in vague allegations." In re Blech Sec. Litig., 928 F. Supp. 1279, 1294 (S.D.N.Y. 1996)

Here, the complaint contains no particulars. In attempting to rope together dozens of bad actors who may have filed fraudulent claims pursuant to a number of different schemes, the complaint fails to provide any specificity as to the fraudulent methods used by any defendant. Teams may have provided inexpensive medical supplies (itself a vast universe of potential products) while charging for a more expensive item, or may have not provided the item at all, or might have used a counterfeit item, or might have failed to pass along a discount received for bulk purchase of items actually provided, or some other fraudulent activity. The No-Fault Clinic may have entered into an agreement with a Retail Defendant or with a Wholesale Defendant or with both, and in some way the extra money above the proper price for an item might have been divided among these bad actors, or all of the money if no item was provided at all. "Such vague allegations are insufficient to satisfy the requirements of 9(b)." Ho Myung Moolsan, 665 F. Supp. 2d at 260. The bloated complaint is entirely generic, failing to sufficiently describe the

11

actions of any defendant. See In re Blech Sec. Litig., 928 F. Supp. at 1294 (dismissing for failure to plead fraud with particularity where "[t]hroughout, the [c]omplaint never delineates the wrongdoing of any of the particular . . . [d]efendants."). It is plaintiff's burden to demonstrate that its allegations establish defendants' liability under RICO, see Gunawan, 897 F. Supp. 2d at 83, and it has failed to do so.

### III.  State law claims

After dismissing plaintiff's RICO claims, the only remaining claims are those asserted under state law pursuant to the court's supplemental jurisdiction. A federal district court "may decline to exercise supplemental jurisdiction over a claim" if it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c) (3); see Castellano v. Bd. of Trs., 937 F.2d 752, 758 (2d Cir. 1991) (quoting United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966)). When all federal claims are eliminated before trial, the balance of factors to be considered – including judicial economy, convenience, fairness, and comity – typically points towards declining to exercise supplemental jurisdiction over any remaining state-law claims. See Kolari v. N.Y.-Presbyterian Hosp., 455 F.3d 118, 122 (2d Cir. 2006). "Courts have generally found that where a RICO claim is dismissed, declining to exercise supplemental jurisdiction over remaining state or common law claims is appropriate." Cappone v. Morrissey, No. 16-CV-7170, 2018 WL 4055280, at *11 (E.D.N.Y. July 27, 2018), report and recommendation adopted, 2018 WL 4054871 (E.D.N.Y. Aug. 24, 2018) (citing Goldfine v. Sichenzia, 118 F. Supp. 2d 392, 407-08 (S.D.N.Y. 2000)).

Accordingly, I decline to exercise supplemental jurisdiction over plaintiff's remaining claims and dismiss them without prejudice.

## CONCLUSION

Plaintiff's motion for default judgment is denied. The RICO claims are dismissed for failure to state a claim and the state claims are dismissed because the Court declines to exercise supplemental jurisdiction. The Clerk is directed to enter judgment accordingly. and the case dismissed.

**SO ORDERED.**

Digitally signed by Brian M. Cogan

_____
U.S.D.J.

Dated: Brooklyn, New York
December 12, 2020